**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF SOUTH CAROLINA
ROCK HILL DIVISION**

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | * | |
| *ex rel.* BRIANNA MICHAELS and | * | |
| AMY WHITESIDES, | * | |
| | * | |
| Plaintiffs, | * | |
| | * | |
| vs. | * | **Civil Action No.: 0:12-cv-03466-JFA** |
| | * | |
| AGAPE SENIOR COMMUNITY, INC.; | * | **SECOND AMENDED** |
| AGAPE SENIOR PRIMARY CARE, INC.; | * | **COMPLAINT** |
| AGAPE SENIOR SERVICES, INC.; | * | |
| AGAPE SENIOR, LLC; | * | |
| AGAPE MANAGEMENT SERVICES, INC.; | * | JURY TRIAL DEMANDED |
| AGAPE COMMUNITY HOSPICE, INC.; | * | |
| AND AGAPE NURSING AND | * | |
| REHABILITATION CENTER, INC. | * | |
| d/b/a AGAPE REHABILITATION OF | * | |
| ROCK HILL a/k/a AGAPE SENIOR POST | * | |
| ACUTE CARE CENTER – ROCK HILL a/k/a | * | |
| EBENEZER SENIOR SERVICES, LLC; | * | |
| AGAPE SENIOR FOUNDATION, INC.; | * | |
| AGAPE COMMUNITY HOSPICE OF | * | |
| ANDERSON, INC.; AGAPE HOSPICE OF THE | * | |
| PIEDMONT, INC.; AGAPE COMMUNITY | * | |
| HOSPICE OF THE GRAND STRAND, INC.; | * | |
| AGAPE COMMUNITY HOSPICE OF THE | * | |
| PEE DEE, INC.; AGAPE COMMUNITY | * | |
| HOSPICE OF THE UPSTATE, INC.; AGAPE | * | |
| HOSPICE HOUSE OF HORRY COUNTY, INC.; | * | |
| AGAPE HOSPICE HOUSE OF LAURENS, LLC; | * | |
| AGAPE HOSPICE HOUSE OF THE LOW | * | |
| COUNTRY, INC.; AGAPE HOSPICE HOUSE | * | |
| OF THE PIEDMONT, INC.; AGAPE | * | |
| REHABILITATION OF CONWAY, INC.; | * | |
| AGAPE SENIOR SERVICES FOUNDATION, | * | |
| INC.; AGAPE THERAPY, INC.; AGAPE | * | |
| HOSPICE; HOSPICE PIEDMONT; HOSPICE | * | |
| ROCK HILL; and CAROLINAS | * | |
| COMMUNITY HOSPICE, INC., | * | |
| | * | |
| Defendants. | * | |
| | * | |

**SECOND AMENDED COMPLAINT FOR DAMAGES AND OTHER RELIEF UNDER THE FALSE CLAIMS ACT, ANTI-KICKBACK STATUTE AND HEALTH CARE FRAUD STATUTE**

Plaintiff-Relators, Brianna Michaels and Amy Whitesides, on behalf of themselves and the United States of America, through their attorneys, allege as follows:

## I.    PARTIES RELATORS

1. Plaintiff-Relator Brianna Michaels ("Michaels") is a citizen of the United States of America, residing in Rock Hill, South Carolina. At all material times herein, Michaels was and is a registered nurse licensed to practice in South Carolina. From April 11, 2012 to August 23, 2012, Michaels was employed by Defendants, specifically to work for a hospice organization operating under various names, including, but not limited to, Agape Senior, LLC, Agape Hospice, Hospice Piedmont, Hospice Rock Hill, Agape Community Hospice, Inc., and Carolinas Community Hospice, Inc., as a RN Case Manager, among other things, for the hospice program operating in the Rock Hill, South Carolina area. (Hereinafter Defendants will be collectively referred to as "Agape" where only one specific cannot be clearly delineated.) The termination of Michaels' employment was a retaliatory discharge by Defendants for "losing a patient" by allowing one of her patients (JT) to go to a hospital emergency room, as the patient and his family wanted, instead of following her supervisors' instructions to transfer him to the Agape skilled nursing facility for General Inpatient Care ("GIP"), a higher level of care reimbursed at a higher rate than routine hospice services, regardless of the patient's wishes and health condition.

2. Plaintiff-Relator Amy Whitesides ("Whitesides") is a citizen of the United States of America and a resident of the State of South Carolina, residing at 268 N. Burris Road, Sharon, York County, South Carolina. At all material times herein, Whitesides was and is a registered

2

nurse licensed to practice in South Carolina. From July 7, 2010 to approximately January 7, 2013, Whitesides was employed by Defendants specifically to work as a RN Case Manager in their hospice program operating in the Upstate/Spartanburg, York and Rock Hill, South Carolina areas.

3. As a result of their employment with Defendants, Relators have personal and direct knowledge of the fraudulent practices of the Defendants, as set forth herein, that are in direct violation of federal and state health care benefit program requirements and federal laws.

4. Relators bring this action based on their direct, independent and personal knowledge and observations, conversations, meetings, email communications, medical records, documentation and based on facts known to them.

5. Relators are aware of patients fraudulently admitted to hospice who do not qualify for the program, as well as patients fraudulently and repeatedly re-certified to hospice who do not qualify for the program.

6. Relators have questioned hospice determinations but have been ignored.

7. Relators are the "original source" of the information alleged herein as that term is used in the False Claims Act context.

8. Relators bring this action on behalf of the United States of America pursuant to 31 U.S.C. §3730(b)(1), 42 U.S.C. §1320a-7b et seq., and 18 U.S.C. §1347 et seq., federal law and the common law of South Carolina. The United States of America is a sovereign country whose Department of Health and Human Services pays claims submitted to it by Defendants through its Medicaid, Medicare, Tricare and other programs for hospice, therapy, assisted living and skilled nursing services, among other services provided by Defendants.

## II. PARTIES - DEFENDANTS

9.  That upon information and belief, Defendant Agape Senior Community, Inc. is a corporation authorized and existing under the laws of the State of South Carolina and is doing business in York County and other locations throughout the State of South Carolina.

10. That upon information and belief, Defendant Agape Senior Primary Care, Inc. is a corporation authorized and existing under the laws of the State of South Carolina and is doing business in York County and other locations throughout the State of South Carolina.

11. That upon information and belief, Defendant Agape Senior Services, Inc. is a corporation authorized and existing under the laws of the State of South Carolina and is doing business in York County and other locations throughout the State of South Carolina. Also, upon information and belief, Defendant Agape Senior Services, Inc. functions as a type of management, parent, umbrella or holding entity for and encompasses Defendants' hospice, therapy, skilled nursing, assisted living and/or other services currently providing services and doing business in approximately 24 locations throughout South Carolina under the names "Agape Hospice of …", "Agape Community Hospice of …", "Agape Hospice House of …", "Agape Senior - …", "Agape Rehabilitation of …", "Agape Therapy of ….", and "Agape Senior Nursing and Rehabilitation …" followed by the name of the area in which they are providing such services. In addition to the chain of command at each facility and/or program (i.e., Hospice of Rock Hill, Rock Hill assisted living facility), each geographical region has a separate chain of command that includes all facilities/programs located within that designated area regardless of the type of service offered by each, (i.e., Regional President) that supersedes the authority of each individual facility or program.

12. That upon information and belief, Defendant Agape Senior, LLC is a limited liability

corporation authorized and existing under the laws of the State of South Carolina and is doing business in York County and other locations throughout the State of South Carolina. Also, upon information and belief, Defendant Agape Senior, LLC functions as a type of management, umbrella or holding entity for and encompasses Defendants' hospice, therapy, skilled nursing, assisted living services and/or other services, currently providing services and doing business in approximately 24 locations throughout South Carolina under the names "Agape Hospice of …", "Agape Community Hospice of …", "Agape Hospice House of …", "Agape Senior - …", "Agape Rehabilitation of …", "Agape Therapy of ….",  and "Agape Senior Nursing and Rehabilitation …" followed by the name of the area in which they are providing such services.

13. That upon information and belief, Defendant Agape Management Services, Inc. is a corporation authorized and existing under the laws of the State of South Carolina and is doing business in York County and other locations throughout the State of South Carolina.

14. That upon information and belief, Defendant Agape Community Hospice, Inc. is a corporation authorized and existing under the laws of the State of South Carolina and is doing business in York County and other locations throughout the State of South Carolina. Also, upon information and belief, Defendant Agape Community Hospice, Inc. is part of the Agape Senior, LLC network of companies, functions as a type of management, parent, umbrella or holding entity for and encompasses Defendants' hospice, therapy, skilled nursing, assisted living and/or other services currently providing services and doing business in approximately 24 locations throughout South Carolina under the names "Agape Hospice of …", "Agape Community Hospice of …", "Agape Hospice House of …",  "Agape Senior - …", "Agape Rehabilitation of …", "Agape Therapy of ….",  and "Agape Senior Nursing and

Rehabilitation …" followed by the name of the area in which they are providing such services.

15. That upon information and belief, Defendant Agape Nursing and Rehabilitation Center, Inc. ("Agape N & R") (a/k/a Ebenezer Senior Services, LLC) a/k/a Agape Senior Post Acute Care Center – Rock Hill is a corporation authorized and existing under the laws of the State of South Carolina and is doing business in York County in the State of South Carolina.

16. That upon information and belief, Defendant Agape Senior Foundation, Inc. is a corporation authorized and existing under the laws of the State of South Carolina and is doing business in York County and other locations throughout the State of South Carolina.  Also, upon information and belief, Defendant Agape Senior Foundation, Inc. is part of and/or closely related to the Agape Senior, LLC network of companies, functions as a type of management, parent, umbrella or holding entity for and encompasses Defendants' hospice, therapy, skilled nursing, assisted living and/or other services currently providing services and doing business in approximately 24 locations throughout South Carolina under the names "Agape Hospice of …", "Agape Community Hospice of …", "Agape Hospice House of …",  "Agape Senior - …", "Agape Rehabilitation of …", "Agape Therapy of ….",  and "Agape Senior Nursing and Rehabilitation …"  followed by the name of the area in which they are providing such services.

17. That upon information and belief, Defendant Agape Community Hospice of Anderson, Inc. is a corporation authorized and existing under the laws of the State of South Carolina and is doing business in Anderson County and other locations throughout the State of South Carolina.

18. That upon information and belief, Defendant Agape Hospice of the Piedmont, Inc. is a

corporation authorized and existing under the laws of the State of South Carolina and is doing business in York, Lancaster and Chester counties and other locations throughout the State of South Carolina.

19. That upon information and belief, Defendant Agape Community Hospice of the Grand Strand, Inc. is a corporation authorized and existing under the laws of the State of South Carolina and is doing business in Horry and Georgetown counties and other locations throughout the State of South Carolina.

20. That upon information and belief, Defendant Agape Community Hospice of the Pee Dee, Inc. is a corporation authorized and existing under the laws of the State of South Carolina and is doing business in Darlington, Dillon, Florence, Lee, Marion, Marlboro and Williamsburg counties and other locations throughout the State of South Carolina.

21. That upon information and belief, Defendant Agape Community Hospice of the Upstate, Inc. is a corporation authorized and existing under the laws of the State of South Carolina and is doing business in Greenville, Spartanburg, Anderson, Pickens, Cherokee, Oconee, Union, Laurens, Greenwood, and Abbeville counties and other locations throughout the State of South Carolina.

22. That upon information and belief, Defendant Agape Hospice House of Horry County, Inc. is a corporation authorized and existing under the laws of the State of South Carolina and is doing business in Horry County and other locations throughout the State of South Carolina.

23. That upon information and belief, Defendant Agape Hospice House of Laurens, LLC is a limited liability corporation authorized and existing under the laws of the State of South Carolina and is doing business in Laurens County and other locations throughout the State of South Carolina.

24. That upon information and belief, Defendant Agape Hospice House of the Low Country, Inc. is a corporation authorized and existing under the laws of the State of South Carolina and is doing business in Beaufort, Berkeley, Charleston, Colleton, Dorchester, Hampton, and Jasper counties and other locations throughout the State of South Carolina.

25. That upon information and belief, Defendant Agape Hospice House of the Piedmont, Inc. is a corporation authorized and existing under the laws of the State of South Carolina and is doing business in York, Lancaster and Chester counties  and other locations throughout the State of South Carolina.

26. That upon information and belief, Defendant Agape Rehabilitation of Conway, Inc. is a corporation authorized and existing under the laws of the State of South Carolina and is doing business in Horry and Georgetown counties and other locations throughout the State of South Carolina.

27. That upon information and belief, Defendant Agape Senior Services Foundation, Inc. is a corporation authorized and existing under the laws of the State of South Carolina and is doing business in York County and other locations throughout the State of South Carolina. Also, upon information and belief, Defendant Agape Senior Services Foundation, Inc. is part of and/or closely related to the Agape Senior, LLC network of companies, functions as a type of management, parent, umbrella or holding entity for and encompasses Defendants' hospice, therapy, skilled nursing, assisted living and/or other services currently providing services and doing business in approximately 24 locations throughout South Carolina under the names "Agape Hospice of …", "Agape Community Hospice of …", "Agape Hospice House of …", "Agape Senior - …", "Agape Rehabilitation of …", "Agape Therapy of ….",  and "Agape Senior Nursing and Rehabilitation …"  followed by the name of the area in which they are

providing such services.

28. That upon information and belief, Defendant Agape Therapy, Inc. is a corporation authorized and existing under the laws of the State of South Carolina and is doing business in York County and other locations throughout the State of South Carolina.

29. That upon information and belief, Defendant Agape Hospice is a corporation that changed its name to Ascension Hospice, Inc. in 2004 and was dissolved in June 2013 according the South Carolina Secretary of State and is doing business in York County and other locations throughout the State of South Carolina.

30. That upon information and belief, Defendant Hospice Piedmont is a corporation not listed with the South Carolina Secretary of State and is doing business in York County and other locations throughout the State of South Carolina.

31. That upon information and belief, Defendant Hospice Rock Hill is a corporation not listed with the South Carolina Secretary of State and is doing business in York County and other locations throughout the State of South Carolina.

32. That upon information and belief, Defendant Carolinas Community Hospice, Inc. is a corporation authorized and existing under the laws of the State of South Carolina and is doing business in York County and other locations throughout the State of South Carolina.

33. That upon information and belief, all Defendants except Agape Senior Foundation, Inc. and Agape Senior Services Foundation, Inc. are for-profit entities incorporated under the laws of the State of South Carolina.

34. That upon information and belief, Defendants delivered hospice, therapy, skilled nursing, medical and assisted living, as well as other care and services, for a fee and had authority, express or implied, to control the means and agencies employed to execute the delivery of

such care to its patients and/or residents.

35. That upon information and belief, Defendants were involved in the ownership, operation, and/or management of medical, nursing, hospice, skilled nursing, assisted living, therapy and other care (hereafter "programs" or "services") for profit. Further, Defendants, at all times relevant hereto, exerted managerial and operational control over such programs, and that such control was so extensive and pervasive that Defendants actually operated and managed such programs.

36. That upon information and belief, all Defendants named herein are or have been involved in training, supervision, development, management, consulting and implementation of policies and procedures regarding delivery, documentation, claim submission and billing for Defendants' services and have directly controlled such operations.

37. That upon information and belief, Defendants provided hospice, therapy, skilled nursing, medical, assisted living and other care and services to patients residing in a variety of settings, including, but not limited to, private homes, assisted living facilities, skilled nursing facilities and hospice houses.

38. That Defendants were and are, at all times relevant to this action, "participating providers", as defined in Title 42 of the Code of Federal Regulations, in one or more of the Federal health care benefit programs by participating, enrolling and entering into Participating Provider Agreements that require the providers to submit only truthful and accurate claims for reimbursement.

39. That upon information and belief, Defendants have engaged in substantial business activities in South Carolina, including, but not limited to, submission of false statements and false claims for care and services provided and/or allegedly provided in South Carolina,

marketing, management, supervision, training, administration, operation, control and/or ownership of the entities and facilities providing their services at all relevant times hereto.

40. That upon information and belief, Defendants have promulgated and established the policies, procedures, protocols, marketing, staffing, administrative, clinical, documentation, billing and budgetary decisions for their services, and have directly controlled any and all business and billing practices for same.

### III.  JURISDICTION AND VENUE

41. Plaintiff Relators, through their counsel, have voluntarily provided the information to the Government before filing this action.

42. Plaintiff Relators, through their counsel, bring this action against the above-named Defendants as a result of Defendants' violations of the Federal Anti-Kickback Statute by offering prohibited inducements for utilization (i.e., referral, enrollment) of their hospice program and False Claims Act and Health Care Statute by knowingly and repeatedly submitting false statements and false claims to the United States to obtain Medicare, Medicaid and Tricare money payments from the federal government that would not have been paid had the truth of the false statements and false claims been known, pursuant to the *qui tam* provision of the False Claims Act, 31 U.S.C. §§3729 et seq., as well as the Anti-Kickback and Health Care Fraud Statutes, to recover treble damages, civil penalties and all other relief available under the Act and Statutes.

43. As a result of Defendants' knowing and recurring false and/or fraudulent statements, claims, enrollments, actions, inducements and submissions, Defendants wrongfully obtained millions of dollars from the United States that they were not entitled to receive.

44. This action arises under 31 U.S.C. §§3729 et seq., 42 U.S.C. §1320a-7b et seq., and 18

U.S.C. §1347 et seq.  This Court has subject matter jurisdiction over this action pursuant to 31 U.S.C. §3732(a). This Court also has jurisdiction over this action pursuant to 28 U.S.C. §1331.

45. This Court may exercise personal jurisdiction over Defendants pursuant to 31 U.S.C. §3732(a) because Defendants reside and transact business in the State of South Carolina. Additionally, the Defendants committed acts in violation of 31 U.S.C. §§3729 et seq., 42 U.S.C. §1320a-7b et seq., and 18 U.S.C. §§1347 et seq. within the judicial district which is the District of South Carolina.

46.  Jurisdiction lies in this Court pursuant to 28 U.S.C. §§1345 and 1355, as well as supplemental jurisdiction under 28 U.S.C. §1367(a).

47. Venue is proper in this District pursuant to 31 U.S.C. §§3729 et seq., 42 U.S.C. §1320a-7b et seq., and 18 U.S.C. §§1347 et seq., because the acts proscribed therein and complained of herein took place within this District, including the Rock Hill Division, as well as other places in South Carolina.  Additionally, venue is proper in this District pursuant to 28 U.S.C. §1391(b) and (c) because at all times material and relevant, Defendants transacted business in this District as well as this Division, including, but not limited to, the actions described herein.

### IV. FEDERAL HEALTH CARE BENEFIT PROGRAMS

48. Upon information and belief, Medicare, Medicaid and Tricare are each considered a "health care benefit program" as defined in 18 U.S.C. §24(b) and a "federal health care program" as defined in 42 U.S.C. §1320a-7b(f).

49.  Upon information and belief, the laws, regulations and rules applicable to Medicare regarding the payment of claims for health care services are likewise applicable to Tricare

and Medicaid, and there are additional state laws, regulations and rules regarding Medicaid.

50. Upon information and belief, the federal health care benefit programs require health care providers to file an enrollment application in order to qualify to receive the programs' benefits. Upon information and belief, Defendants submitted enrollment applications to these federal program providers certifying that they would comply with Medicare and Medicaid laws, regulations, and program instructions, and further certified that they understood that payment of a claim by Medicare and Medicaid was conditioned upon the claim and underlying transaction complying with such laws, regulations, and program instructions, including, but not limited to, the Federal Anti-Kickback, Health Care Fraud and Stark statutes.

51. Section 1814(a)(7) of the Social Security Act (42 U.S.C. §1395) specifies that an individual must be entitled to Part A of Medicare and be certified as terminally ill to be eligible to elect hospice case under Medicare. An individual is considered to be terminally ill if the medical prognosis is that the individual's life expectancy is six months or less if the illness runs its normal course. Certification of the terminal illness for hospice benefits shall be based upon the criteria set forth herein and the clinical judgment of the hospice physician and the individual's attending physician. An individual, or his authorized representative, must elect hospice care to receive it. If the individual, or authorized representative, elects to receive hospice care, he or she must file an election statement with particular hospice. The written certification for eligibility for a hospice election must include:

    a.    The statement that the individual's medical prognosis is that their life expectancy is six months or less if the terminal illness runs its normal course;

    b.    Specific clinical findings and other documentation supporting a life expectancy of

six months or less; and

c.      The signature of the physician.

52. The hospice must retain the certification statements.

53. Section 1814(a)(7) of the Social Security Act (42 U.S.C. §1395) further requires the following in a subsequent 90 or 60-day period:

a.      the medical director or the individual's attending physician recertifies at the beginning of the period that the individual is terminally ill based on such clinical judgment;

b.      a written plan for providing hospice care with respect to such individual has been established (before such care is provided by, or under arrangements made by, that hospice program) and is periodically reviewed by the individual's attending physician and by the medical director (and the interdisciplinary group of the hospice program; and

c.      such care is being or was provided pursuant to such plan of care.

54. Additionally, on and after January 1, 2011, §1814(a)(7) of the Social Security Act (42 U.S.C. §1395) further requires that a hospice physician or nurse practitioner has a face-to-face encounter with the individual to determine continued eligibility of the individual for hospice care prior to the 180th-day recertification and each subsequent recertification and attests that such visit took place in accordance with established procedures.

55. 42 U.S.C. §1395y(a)(1) states, in relevant part, that no payment may be made under part A or part B of this subchapter for any expenses incurred for items or services that are not reasonable and necessary, in the case of hospice care, for the palliation or management of terminal illness.

14

56. 42 CFR §409.30 states that post-hospital skilled nursing facility care is covered only for days when the beneficiary needs and receives care of the level described in 42 CFR §409.31. A beneficiary in a skilled nursing facility is also considered to meet the level of care requirements of §409.31 when assigned to one of the Resource Utilization Groups that is designated as representing the required level of care.

57. 42 CFR §409.31(a) defines the level of care requirement referenced in the preceding paragraph as skilled nursing and skilled rehabilitation services that are ordered by a physician and require the skills of technical or professional personnel such as nurses, physical therapists, occupational therapists, and speech pathologists, and are provided by, or under the supervision of, such personnel.

58. 42 CFR §409.31(b) further states, in relevant part, that the beneficiary must require skilled nursing or skilled rehabilitation services, or both, on a daily basis for a condition for which the beneficiary received inpatient hospital services or was receiving care in a skilled nursing facility and had previously received inpatient hospital services.

## V. DEFENDANTS' WRONGFUL ACTS, FRAUDULENT SCHEMES AND PROHIBITED INDUCEMENTS

59. During their employment with Defendants, the Relators' regular duties and responsibilities included, among other things, patient assessment, evaluation, and care, as well as completing paper and electronic forms relating to patient enrollment, transfer, treatment, and certification, which supports and relates to billing to Medicare, Medicaid and/or Tricare, among other payors, on behalf of their assigned Agape hospice patients.

60. Relators are familiar with the regulatory requirements and Defendants' directives, instructions and actions contrary thereto.

61. Relators have discovered so many instances of fraud that they believe the marketing, false certifications, false recertifications, and fraudulent billing of federal health care benefit programs for care to unqualified patients, as well as billing for care and services not provided, among other things, are widespread, systematic practices of Defendants.

62. Relators are aware of the following practices of Defendants occurring on an ongoing, regular, systematic and widespread basis:

    a.  Certification and Recertification of Hospice Patients

      1. Physicians

        A.  The certification and/or recertification documents of many hospice patients have not been signed by physicians at all:

          i.  For her 11th certification period, starting on June 15, 2012, hospice patient JA's certification was not signed.

          ii.  For her 6th certification period, starting on August 21, 2012, hospice patient EJ's certification was not signed.

          iii.  For her 6th certification period, starting on August 19, 2012, hospice patient MHM's certification was not signed.

          iv.  Included herein are but a few examples of the conduct described above and in more detail below.  Many other instances have been identified.

        B.  The certifying information is often supplied by the hospice nursing staff and/or nurse practitioner and the recertification is signed by nurse practitioner Doris Chitwood, with no doctor providing such recertification:

i. For her 17th certification period, starting on September 16, 2012, hospice patient MH's recertification was not signed by a Medical Doctor, as required, but only by Nurse Practitioner Doris Chitwood.

ii. For his 14th certification period, starting on October 15, 2012, hospice patient CM's recertification was not signed by a Medical Doctor, as required, but only by Nurse Practitioner Doris Chitwood.

iii. For her 13th certification period, starting on September 17, 2012, hospice patient CW's recertification was not signed by a Medical Doctor, as required, but only by Nurse Practitioner Doris Chitwood.

iv. For her 15th certification period, starting on October 9, 2012, hospice patient SD's recertification was not signed by a Medical Doctor, as required, but only by Nurse Practitioner Doris Chitwood.

v. For his 11th certification period, starting on September 2, 2012, hospice patient BC2's recertification was not signed by a Medical Doctor, as required, but only by Nurse Practitioner Doris Chitwood.

vi. For her 12th certification period, starting on September 1, 2012, hospice patient KP's recertification was not signed by a Medical Doctor, as required, but only by Nurse Practitioner Doris Chitwood.

C.  The certification and/or recertification documents of many hospice patients were not timely signed and, in some instances, have backdated the signatures;

i. One to two weeks after Melissa Morton's employment ended, Cindi Hurst, Jody Lyles and other corporate executives from Agape Senior, LLC

entered the Agape Regional Hospice office in Rock Hill and handed each hospice nurse the Certificate of Terminal Illness ("CTI") and recertification for each of her patients that needed to be completed to have the records complete and instructed them to write on a post-it note details of each patient's condition that Dr. Sinclair could then write in herself and sign.  At least some of these records were the same ones that Ms. Morton had Dr. Sinclair sign only days earlier, but Ms. Hurst, Ms. Lyles and the other Agape executives made it clear that the nurses were only to write on post-it notes and that they wanted the doctor to write in the notes and her signature on the actual form.

ii. Face to face visits in Columbia were performed late, but Defendants still submitted bills for the entire certification period.

iii. In IDG meetings, Dr. Sinclair would sometimes ask what date she was supposed to enter next to her signature.  Mo Green, Stacey Hargett and/or Melissa Morton routinely instructed the doctor not to write in the date of her signature, only to sign her name, and they would fill in the date for her.  Later, the Primary Care Coordinator ("PCC") and administrative assistants would fill in the desired date on the paper and in the Consolo system so that it had a date on it that allowed Defendants to receive full reimbursement even if they gave it to the doctor for her signature late.

iv. The date a form was printed is usually printed across the bottom.  While in the Rock Hill office, Amy overheard someone say that sometimes they just cut off the bottom of the pages where the date was printed.

D.   Many doctors' orders do not state that the individual's medical prognosis is that their life expectancy is six months or less if the terminal illness runs its normal course and/or contain no specific clinical findings or other documentation supporting a life expectancy of six months or less:

i. On her 1st certification, which was not signed by a doctor, hospice patient EC has listed as her only diagnosis "PGBA – Adult Failure To Thrive – Diagnosis Not Terminal".

ii. On his 14th certification, which was not signed by a doctor, hospice patient GS is listed with a primary diagnosis of "heart disease, unspecified" on March 5, 2010, his status is listed as "nonterm" and under the heading of "Diagnoses" is listed "Heart Disease – Diagnosis Not Terminal" and no other diagnoses are listed.

iii. For his 14th certification period, hospice patient WS's recertification listed his status as "nonterm" and his diagnosis only as "chronic airway obstruction" and no findings to support hospice services.

iv. On his/her 7th certification, which was not signed by a medical doctor, hospice patient JD, had her "Status" listed as "Nonterm" and her only Diagnosis is "dementia in conditions classified elsewhere".

v. For her 10th certification period, hospice patient JP's recertification listed her status as non-terminal with a diagnosis of "debility, unspecified" and no findings to support hospice status.

vi. For her 6th certification period, hospice patient VC's recertification listed her diagnosis only as "debility, unspecified" and no findings to support

19

hospice status.

vii. For her 10th certification period, hospice patient ER's recertification listed her diagnosis only as "debility, unspecified" and no findings to support hospice status. Some of Defendants' hospice patients have listed diagnoses on certification/recertification forms that do not qualify for hospice services.

viii. For her 5th certification period, hospice patient BG's recertification listed her diagnoses only as "presenile dementia, uncomplicated", osteoarthrosis, and osteopathy and no findings to support hospice status. Some of Defendants' hospice patients have listed diagnoses on certification/recertification forms that do not qualify for hospice services.

ix. No doctor ever told JT or his family that he had a medical prognosis with a life expectancy of six months if the terminal illness ran its normal course, either before or during JT's years of care by the Agape hospice program in the Rock Hill, South Carolina area.

x. No doctor has ever told JR or his family that he had a medical prognosis with a life expectancy of six months or even that he had a terminal illness – either before or during JR's years-long admission to the Agape hospice program in the York, South Carolina area, or even since his discharge over a year ago.

E.  Defendants' doctors frequently sign certifications of patients as qualifying for hospice without having seen the patient or having reviewed patient records at the time of their certification.

      i. Regularly at Interdisciplinary Group ("IDG") meetings, Dr. Sinclair would listen to discussion of a hospice patient and ask incredulously "and they are hospice?", and then sign the certification.

      ii. When Dr. Sinclair saw ML, who was in her nineties but had no terminal illness, was admitted to hospice services, she asked in astonishment, "[t]his woman's on hospice?"

2. False documentation of condition

    A. The hospice documentation as to an individual's condition is not accurate and/or is internally inconsistent;

    i. Hospice patient certification and recertification records showing diagnoses, conditions and functional capacities that are in direct odds with patients' diagnoses from treating physician(s) and patient's documented assessments:

      a) When Amy Whitesides called Dr. Adrian Thomas to obtain records for a potential hospice patient, he asked why she was being admitted and that he didn't understand how she qualified.

      b) During his 17th certification period, Amy Whitesides stated that JR should be discharged from hospice services.  However, a social worker, who is not a nurse, said he sounded awful and short of breath.  Based on the latter, he continued on hospice services as a full code.  At one point, JR was discharged from hospice for a hernia repair and then readmitted to hospice.  He was not truly eligible for hospice services prior to or following the hernia surgery.

      c) See also the records of the following hospice patients:

        1) ML;

        2) BJ;

        3) JR;

        4) BG;

        5) WS;

        6) FS; and

        7) SW.

ii. Hospice patient records show many requiring "100% assistance" with activities of daily living which is inconsistent with other hospice records and records of other providers and/or facilities:

a) For example, see records of patient HL;

b) For example, see records of patient MM; and

c) For example, see records of patient CW.

B. Chart to the negative

i. In a Monday morning meeting, Doris Chitwood told the nurses and others present that she had to do recertifications and that her assessment has to match the nurse's assessments, so they needed to be sure to chart to the negative.

ii. In Monday morning meetings, Kelly Stone, Dee Dee Henderson and Melissa Morton repeatedly directed that nurses must chart patients declining.

iii. Mo Green, Stacey Hargett and other Agape Senior managers and executives instructed the hospice nurses to always document that the

patient is declining and not to state "no change" or "stable", regardless of the truth, so the patient remains hospice eligible.

    iv. When Amy charted a good day for a patient, that he was out driving his car and had gone to the store, she was instructed not to do that. She was told not to chart a good day and only chart to the negative. Cindi Hurst and others reiterated this many times in monthly nurse meetings, special meetings, and Monday morning meetings.

C. "Make them fit"

    i. GIP admission

        a) Mo Green, Marge Picarsic and Kelly Stone instructed GIP nurses to "make them fit", in other words, appear to qualify for GIP services.

        b) Mo Greene instructed hospice nurses to enter the patient information, see if the program came up with a GIP hospice-eligible diagnosis, and, if not, then tweak the data entered to produce a GIP hospice-eligible diagnosis.

        c) If the GIP nurses deemed a patient not eligible for GIP care, they were given the following 2 options:

            1) The GIP nurse insisted that the referring nurse come up with a GIP-appropriate diagnosis and admit them to GIP services herself.

            2) Call Mo Greene, Marge Picarsic and/or Kelly Stone.

d) When a nurse determined a Lancaster patient was not eligible for hospice services, a new nurse was sent to admit the patient and did so.

1) The patient was brought in for GIP care to adjust her medications.

2) All of her medications were changed.

3) As a result, she fell repeatedly and died.

ii. GIP stay versus discharge

a) If GIP nurses planned to discharge a hospice patient from GIP services, she was instructed to take the following steps:

1) Consult with the facility medical director to determine whether a discharge was appropriate; and

2) If they decided discharge was appropriate, take that decision to Mo Greene, Marge Picarsic or Kelly Stone to make a final decision, considering, among other things:

A) how long the patient was on GIP care; and/or

B) whether Colace or some minor medication change or dressing was in order, which would require an additional 3 days of GIP care for monitoring, thereby lengthening the number of days of GIP care to reach the maximum allowed for reimbursement.

b) GIP nurses were to keep patients in GIP as long as possible, changing the problem being addressed to a secondary diagnosis, if necessary, to keep the patient in GIP longer.

 1) KP – was going to be discharged since pain resolved, but Mo Greene determined that wound dressings were now "necessary" and required staying in GIP.

 2) JT – was going to be discharged since initial issue of pneumonia resolved, but was kept longer to apply Sure-prep wipe 3 times per day, although that could have been done at home.

iii. Routine hospice care eligibility

a) Ms. Green instructed nurse case managers to immediately let her, Stacey Hargett or Dee Dee Henderson know if the nurse thought the patient did not qualify for hospice. Then, one of them or another nurse would assess and admit the patient.

b) Mo Green, Stacey Hargett and Dee Dee Henderson instructed nurses to make "terminal" the individuals they were sent out to assess so they could be admitted to hospice services.

1) Amy Whitesides and Cindy Stevens were sent to assess and admit a potential new hospice patient in the Upstate region. After the assessment, Amy called the office, as instructed, to let them know she didn't feel the person was eligible for hospice. In response, Mo Green and Stacey Hargett instructed her to "make them fit", in other words, admit the patient and find something to justify it.

2) Jody Lyles came in with Marge Picarsic to the Hospice Office in Rock Hill after the computer program Consolo was being used and instructed the nurse case managers to always answer "yes" to the question on the electronic form asking whether doctors' admission orders state the patient's life expectancy is six months or less if the illness runs its normal course. She explained that assumption should be made regardless of whether the doctors' orders specifically state such. Nurses were also to change the PGBA if the current one was not eligible for hospice services.

3) Melanie Pruitt, a marketer for Defendants' hospice services, had admission paperwork signed at the hospital and then sent Amy Whitesides to the patient's home that night to assess that patient. After visiting the patient, Amy texted Mo Greene to inform her that the patient was not hospice appropriate. Mo Green responded that Melanie Pruitt had already filled out the paperwork, so the patient was already admitted and just needed a nursing assessment.

4) Janet DiNino scolded Amy Whitesides in the Rock Hill office for not admitting someone with a history of cancer years ago, stating "once you have cancer, you always have cancer."

5) Janet DiNino scolded Amy Whitesides on another occasion for not admitting a 98 year-old although she had no health conditions qualifying her for hospice services.

6) Another nurse was similarly instructed that if a person is in their nineties and has safety issues or a doctor refers her, she is to be put on hospice services and then see if they decline.

A) Accordingly ML was admitted to hospice services.

B) However, Dr. Sinclair asked in astonishment, "[t]his woman's on hospice?"

7) EJ

8) WL

b. Marketing of Hospice Program

1. Marketing to assisted living and skilled nursing facilities that in exchange for enrolling a designated number of residents in Defendants' hospice program, the facility will receive from the hospice program a nurse and/or nursing assistant assigned exclusively to their facility to assist with patient care, including bathing and feeding, among other things, thereby enabling ALFs to keep residents there that should, and would otherwise, be transferred to a SNF for a higher level of care, reducing the work load for the staff employed at each facility, and counting toward the DHEC staff ratios:

A. Agape's Rock Hill assisted living facility received its own full-time hospice RN and 2 CNAs because of the number of residents/patients at the facility enrolled in Agape's hospice services.

B. Agape's York assisted living facility received its own full-time hospice RN and 2-4 CNAs because of the number of residents/patients at the facility enrolled in Agape's hospice services.

C. Agape's Rock Hill SNF received its own full-time hospice RN and 2 hospice CNAs because of the number of residents/patients at the facility enrolled in Agape's hospice PACC services there.

D. Agape's Rock Hill SNF received its own full-time GIP hospice RN and 1-2 GIP hospice CNAs because of the number of residents/patients at the facility enrolled in Agape's GIP hospice services there.

2. Marketing to prospective hospice patients that hospice will provide all of their medications, supplies and durable medical equipment at no cost to the patients if they enroll in the hospice program:

A. After hospice admission, they later discover that only those related to their terminal diagnosis and not considered life-sustaining are covered free of charge.

B. Some hospice patients will receive the promised medications, supplies and DMEs free of charge for a limited time, some will continue to receive such if they complain enough, but some will not receive what was promised by Defendants.

C. Defendants discontinued providing Ensure to hospice patient GT.

3. Defendants pressured hospice personnel and nurses to increase the number of GIP patients in the following ways:

A. Coaching calls;

B. Contests to see which office attained the most GIP admissions;

C. Emails:

i. Pushing to meet GIP quota goals;

28

ii. Questioning why specific patients were not GIP; and

ii. Sent to nurse case managers when looking to fill GIP.

D. meetings:

i. In Monday morning meetings, Kelly Stone usually stated the percentage of hospice patients that should be in GIP at all times;

ii. Reasons for GIP; and

iii. How to get more GIP patients.

4. Some of the ways that Defendants suggested to increase the GIP census include the following:

A. Convert patients to GIP status during their hospitalization and continue them as GIP patients in one of Defendants' skilled nursing facilities upon discharge from the hospitals.

B. Look at the Defendants' skilled nursing facility patients on hospice services to see if any are eligible for GIP care:

i. GIP nurses were instructed to do so on a regular basis; and

ii. It was very easy to switch a patient already on hospice and in the skilled nursing facility to GIP status to receive higher reimbursement.

C. Relators received instructions, orally and via electronic communications, to find additional patients to enroll in hospice from facilities where they already had patients in order to meet goals or quotas, regardless of whether they truly qualified for hospice benefits:

        i. Drema Brice instructed Brianna Michaels to find more hospice patients at Willowbrook Skilled Nursing Facility;

        ii. Drema Brice and Rosaline Mitchell instructed Brianna Michaels to find more hospice patients at Divine Manor; and

        iii. Amy Whitesides was instructed to find more hospice patients at Lake Wylie assisted living facility.

5. Incentives were offered and provided to those who enrolled additional hospice patients even if the new enrollees were not terminally ill or entitled to hospice benefits:

      A. Relator Michaels was paid $50 for JP, a Rock Hill ALF resident, being admitted to Agape's hospice services in August 2012;

      B. Relator Michaels was paid $50 for GS, a Divine Manor ALF resident, being admitted to Agape's hospice services in August 2012;

      C. Relator Michaels was paid $100 for HH being admitted to Agape's GIP hospice services in August 2012;

      D. Relator Michaels was paid $100 for KP being admitted to Agape's GIP hospice services in August 2012;

      E. The chaplain also received bonuses for people he referred from his parish, among other places, to hospice and GIP admissions; and

      F. Defendant Agape Senior administrators received bonuses for patients in their respective facilities (i.e., assisted living facility, skilled nursing facility) that were admitted to hospice services.

c. Inappropriate referral to Defendants' GIP care:

1. Defendants strongly encouraged patients, their families, and RN Case Managers to admit patients to Defendants' GIP care in its skilled nursing facilities and hospice houses so that Agape will receive a higher daily reimbursement rate, and discouraged them from seeking hospital care, even when in the patient's best interest medically, so that Agape will not have to pay for those medical costs or discharge the patient; on numerous occasions, this has resulted in imminent and avoidable death to the patient from causes unrelated to their terminal diagnosis, if any, due to patients receiving a lower level of care than required by their medical condition and to qualify as GIP care.

    A. Patients

      i. JT

        a) In August 2012, JT and his brother wanted him to go to hospital;

        b) Brianna called the Agape skilled nursing facility in Rock Hill where the hospice patients receive GIP care and spoke with nurse Jonika Moore;

        c) Jonika told Brianna to send JT to the hospital emergency department because he would not get IV antibiotics or be seen by a doctor until the next day;

        d) Based on her conversation with Jonika and JT's wishes, JT went to the hospital for treatment and Brianna was terminated as a result;

        e) On other occasions when JT was sent for GIP care, he reported being very heavily medicated, put in restraints tied down to the bed, and that other GIP patients were overmedicated as well; and

f) PPD placement in JT and other patients mere days before unnecessary GIP admission shows a clear plan and intent.

ii. HH

a) was having signs of stroke;

b) Brianna admitted him GIP; and

c) He died unnecessarily 2 days later.

2. Unnecessary GIP admissions

A. A very minor medication change was often made to justify the GIP admission;

B. Efforts to provide care at home were not exhausted;

C. Symptoms were not such that they qualified for GIP;

D. When death was imminent the family would be strongly persuaded to transfer the patient so the patient didn't die in their home;

E. Although a higher reimbursement rate applied to GIP patients, the required level of care was often not provided and/or necessary; and

F. PPD placement in patients mere days before unnecessary GIP admissions shows a clear plan and intent.

i. JT

ii. Woman with Parkinson's - Amy was told to place a PPD on her to prepare her for GIP (after Melissa Morton left).

G. By way of example of most, if not all of these points, in June/July 2013, the hospice nurse providing routine home care to JT persuaded him and his family that he needed be admitted to GIP hospice services

in the Agape skilled nursing facility in Rock Hill, despite JT's clear wishes to stay at home, for which the family was required to pay $200 for the first week in GIP and approximately $1,400 per week for each of the next 2 weeks.

3. GIP care instead of respite care:

    A. Hospice house patients were initially a mix of respite and GIP care, but the respite patients were soon replaced so that all of the patients were GIP patients for which Defendants were reimbursed at a higher level.

    B. Hospice patient WHH was brought in for respite care while his wife was hospitalized but was considered a GIP care patient until he reached the maximum number of days and then was switched to respite care.

4. Strongly discouraging the hospital from treating or admitting hospice patients, even when it is in the patient's best interest medically, by requiring RN Case Managers to go to, or at least call, the hospital to instruct hospital personnel that this is a hospice patient, even when the individuals are eligible to receive hospital care for their current acute condition; on numerous occasions, this has resulted in imminent and avoidable death to the patient from causes unrelated to their terminal diagnosis, if any, due to such patients receiving a lower level of care than required by their medical condition; and

    A. Sheet on refrigerator said do not call 911, call Agape first.

    B. Jennifer Peace went to the hospital in an effort to get JT out of the hospital and into GIP hospice care.

      C.  Patient of Tammy Brown.

      D. When Relator Michaels did not follow the Defendants' mandate to transfer hospice patient JT to GIP instead of the hospital, regardless of the situation (including the patient's wishes and in the best interest of the patient's health), Defendants terminated her employment in retaliation and provided a pretextual reason for the retaliatory discharge.

d. Post-hospital skilled nursing facility care ("therapy" or "rehabilitation") was provided unnecessarily to Defendants' hospice patients in the skilled nursing facility:

    1.  Patients were somehow assessed and deemed eligible for routine hospice services by a hospice nurse and also eligible for rehabilitation/therapy services by a therapist.

      a. JT

      b.CY

    2.  The hospice nurse, often unaware that the patient was receiving therapy, was then directed by her superiors to wait until therapy services (which are reimbursed at a rate much higher than routine hospice care) were exhausted before admitting the patient to hospice.

    3.  Upon completion of the maximum period of therapy, patients were then admitted to hospice services.

      A. The administrator of the skilled nursing facility and Kelly Stone scolded hospice nurses who removed patients from rehabilitation services before the maximum benefits period was reached; and

B.  Kelly Stone reported that she would, in turn, be scolded by Dee Dee Henderson for the hospice nurse taking such action.

4. Some of these hospice patients were then deemed eligible for GIP care, which is also reimbursed at a rate much higher than routine hospice care).

5. These patients were truly eligible for hospice services, not rehabilitation services.

6. This approach produced the unfortunate result of patients truly eligible for hospice dying while undergoing therapy (i.e., CY – fought to get off rehabilitation services and the day he finished therapy he was to go to hospice, but died.)

e. While receiving Defendants' hospice services, patients were told to forgo seeing their doctors.  They were told Defendants were their doctor, despite rarely, if ever, seeing an Agape doctor.  Despite not receiving any curative care and rarely, if ever, receiving any medical care, many of Defendants' hospice patients lived for years and some are still living.

1. JT

2. JR (living)

3. MM (living)

4. PZ (living)

f. Defendants presented for and received payment for expenses incurred for items or services that were not reasonable and necessary.

1. Defendants received, in the case of hospice care, payment for expenses incurred for items and services that were not reasonable and necessary for the palliation or management of terminal illness;

2.  Defendants received, in the case of post-hospital skilled nursing facility care, payment for expenses incurred for items and services that were not reasonable and necessary;

3. Defendants received payment of false statements and/or false claims for care and services not provided;

4. Defendants received payments from the federal government that would not have been paid had the truth of the underlying false statements and false claims been known;

5. Several hospice patients (and/or their families), to whom Relators provided care during their employment with Defendants, showed Relators quarterly Medicare Summary Statements and questioned why Agape was receiving thousands of dollars in payments from the federal government for the care they were providing.

    a. GS

    b. WS

    c. KP

6. Former patients of Defendants' hospice programs (and/or their families) provided quarterly Medicare Summary Statements showing payments received for hospice care provided that was neither reasonable nor necessary.

    a. KP

        i. Carolinas Community Hospice Charges

            A. Claim #21324600740407SCR for routine home hospice care in the Rock Hill area for KP for August 2013 was submitted for $4,618.03 by Carolinas Community Hospice, Inc. and paid in the amount of $4,525.67 by the federal government

36

through Medicare.

      B.  Claim #21327402733707SCR for routine home hospice care in the Rock Hill area for KP for September 2013 was submitted for $4,469.06 by Carolinas Community Hospice, Inc. and paid in the amount of $4,379.68 by the federal government through Medicare.

      C.  Claim #21330503920107SCR for routine home hospice care in the Rock Hill area for KP for October 2013 was submitted for $4,633.43 by Carolinas Community Hospice, Inc. and paid in the amount of $4,540.76 by the federal government through Medicare.

      D.  Carolinas Community Hospice, Inc. is located at 805 Buff Street, West Columbia, SC 29169 in Medicare records.   South Carolina Department of Health and Environmental Control ("SCDHEC") records show "Carolinas Community Hospice/Agape Community Hospice" located at the very same address of 805 Buff Street, West Columbia, SC 29169 and serving 46 counties in South Carolina.

    ii. Agape Senior Primary Care doctors' fee charges

    A.  Upon information and belief, Claim #02-12194-085-330 for a visit from Dr. Liu on July 5, 2012, while KP was in Agape's skilled nursing facility post-hospital stay under GIP care, was submitted by Agape Senior Primary Care in the amount of $153.89.  Medicare did not pay any of this amount, but approved $118.84 to be billed to KP and applied toward her deductible.

    B.  Upon information and belief, Claim #02-12205-046-220 for a visit from Dr. Liu on July 19, 2012, noted as discharge day, while KP was in

Agape's skilled nursing facility post-hospital stay under GIP care, was submitted by Agape Senior Primary Care in the amount of $77.05. Medicare did not pay any of this amount, stating it was not covered because KP was enrolled in hospice and that amount may be billed to KP.

C. Upon information and belief, Claim #02-12219-077-180 for a visit from Dr. Liu on July 19, 2012, noted as discharge day, while KP was in Agape's skilled nursing facility under GIP care, was submitted by Agape Senior Primary Care in the amount of $77.05. Medicare paid $52.54 of this amount and stated $13.13 may be billed to KP.

b. JT

i. Carolinas Community Hospice Charges

A. Claim #21206704060507 SCR for routine home hospice care in the Rock Hill area for JT for February 2012 was submitted for $7,792.44 by Carolinas Community Hospice, Inc. and paid in the amount of $4,304.94 by the federal government through Medicare.

B. Claim #21209400889507 SCR for routine home hospice care in the Rock Hill area for JT for March 2012 was submitted for $8,971.83 by Carolinas Community Hospice, Inc. and paid in the amount of $4,601.83 by the federal government through Medicare.

C. Claim #21212303104907 SCR for routine home hospice care in the Rock Hill area for JT for April 2012 was submitted for $8,303.38 by Carolinas

Community Hospice, Inc. and paid in the amount of $4,45.38 by the federal government through Medicare.

D. Claim #21215600923607SCR for routine home hospice care in the Rock Hill area for JT for May 2012 was submitted for $4,601.83 by Carolinas Community Hospice, Inc. and paid in the full amount of $4,601.83 by the federal government through Medicare.

E. Claim #21218401421007SCR for routine home hospice care in the Rock Hill area for JT for June 2012 was submitted for $4,453.38 by Carolinas Community Hospice, Inc. and paid in the full amount of $4,453.38 by the federal government through Medicare.

F. Claim #21221402034007SCR for routine home hospice care in the Rock Hill area for JT for July 2012 was submitted for $4,601.83 by Carolinas Community Hospice, Inc. and paid in the full amount of $4,601.83 by the federal government through Medicare.

G. Claim #21306003391007SCR for 24 days of routine home hospice care in the Rock Hill area for JT (in the amount of $3,575.25) and 4 days of GIP hospice care (in the amount of $2,656.08) in February 2013 was submitted for a total of $6,231.33 by Carolinas Community Hospice, Inc. and paid in the full amount of $6,231.33 by the federal government through Medicare.

H. Claim #21309102942207SCR for routine home hospice care in the Rock Hill area for JT in March 2013 was submitted for $4,618.03 by Carolinas Community Hospice, Inc. and paid in the full amount of $4,618.03 by the federal government through Medicare.

I. Claim #21312104152307SCR for routine home hospice care in the Rock Hill area for JT in April 2013 was submitted for $4,469.06 by Carolinas Community Hospice, Inc. and paid in the full amount of $4,379.68 by the federal government through Medicare.

J. Claim #21315402280607SCR for routine home hospice care in the Rock Hill area for JT for May 2013 was submitted for $4,618.03 by Carolinas Community Hospice, Inc. and paid in the amount of $4,525.67 by the federal government through Medicare.

i. Upon information and belief, Claim #02-13063-116-680 for a visit from Dr. Liu on February 26, 2013, while JT was in Agape's skilled nursing facility under GIP care, was submitted by Agape Senior Primary Care in the amount of $120.00. Medicare paid $69.14 and stated that $17.28 may be billed to JT.

7. Defendants did not properly certify JT as having a life expectancy of six months or less; nonetheless, Medicare paid Defendants for JT's hospice services as set forth herein.

c. J.R.

A. JR received hospice services from Defendants for years despite the fact that hospice care was neither appropriate nor necessary for him. Defendants provided quarterly Medicare billing summaries to JR and his daughter showing that Medicare was paying Defendants for its services. After years of Defendants providing hospice services to JR, Defendants contacted JR's daughter stating that Medicare would no longer cover hospice services for JR and that his hospice services were immediately terminated. JR currently resides with his daughter.

8. All of the amounts billed by and paid to Carolinas Community Hospice and Agape Senior Primary Care on behalf of patients, referenced in the preceding paragraphs, 62(f)(5) – (7), and the subparts thereof, constitute false claims submitted by Defendants and paid by the federal government to Defendants in the amounts detailed above as the claims submitted do not comply with federal requirements that must be met in order to submit and receive payment for such claims, including, but not limited to, the patients not being terminally ill as defined by Medicare, recertifications not being signed by a medical doctor, the services billed for were not reasonable and necessary and/or services billed for were not actually provided.

9. Former patients of Defendants' hospice programs (and/or their families) received and paid invoices for medical and pharmacy services received directly from Defendants although the patients were in Defendants' hospice programs and receiving payment from the federal government during the same time that the services that were being directly billed were rendered, contrary to Medicare requirements.

## FIRST CAUSE OF ACTION
## PRESENTATION OF FALSE CLAIMS
## (FALSE CLAIMS ACT, 31 U.S.C. §3729(a)(1)(A))

63. Plaintiff- Relators hereby incorporate, repeat and reallege all paragraphs of this Second Amended Complaint as if fully set forth herein.

64. Defendants, by or through their agents, officers or employees, knowingly presented or caused to be presented, and continue to present or cause to be presented, false and fraudulent claims for payment or approval to the United States.

65. Defendants presented such false and fraudulent claims with actual knowledge of their falsity, or with reckless disregard or deliberate ignorance of whether or not they were false, and continue to do so.

66. Defendants knowingly submitted false or fraudulent certifications, recertifications and claims for hospice care for patients whom they knew were not terminally ill or not eligible for hospice care benefits. Defendants knew they were not entitled to receive such benefits and payments because the patients were not terminally ill or eligible for hospice care benefits and/or were not provided hospice care but, rather, curative health care.

67. Defendants knew such claims they were submitting were false or fraudulent by virtue of knowing that the patients they were submitting claims on behalf of patients who were not terminally ill or eligible for hospice care benefits.

68. Defendants knowingly submitted false or fraudulent claims for services not provided as required as part of room and board charges at Defendants' ALFs and SNFs. Defendants knew they were not entitled to receive such benefits and payments because they knew they were not providing such care and services as are required for reimbursement of room and board charges.

69. Defendants knew such claims they were submitting were false or fraudulent by virtue of knowing that they were not providing said required care and services to patients on whose behalf they were submitting claims for room and board.

70. The United States relied on these false and fraudulent claims, was ignorant of the truth regarding these claims, and would not have paid the Defendants for these false and fraudulent claims had it known the truth of the falsity of the said federal health care benefit program claims, including Medicare, Medicaid and Tricare claims, by the Defendants.

67. Defendants' fraudulent actions described herein are part of a company-wide, systematic pattern and practice of knowingly submitting or causing to be submitted false claims to the United States through fraudulent certification and re-certification of hospice patients and fraudulent billing of the United States through federal health care benefit programs.

71. That the false or fraudulent claims submitted to the federal government for hospice, assisted living and skilled nursing services were directed, authorized, approved and ratified by all Defendants named herein.

72. As a direct and proximate result of the false and fraudulent claims and statements submitted by Defendants, the United States has suffered damages, and therefore is entitled to treble damages, civil penalties, and all other relief available under the False Claims Act, 31 U.S.C. §§3729 *et seq.*

**SECOND CAUSE OF ACTION**
**MAKING OR USING FALSE RECORDS OR FALSE STATEMENTS**
**(FALSE CLAIMS ACT, 31 U.S.C. §3729(a)(1)(B))**

73. Plaintiff- Relators hereby incorporate, repeat and reallege all paragraphs of this Second Amended Complaint as if fully set forth herein.

74. Defendants, by or through their agents, officers or employees, knowingly made, used or caused to be made or used, and continue to make, use and cause to be made or used, false records or false statements material to the foregoing false or fraudulent claims in order to get these false or fraudulent claims or paid or approved by the United States Government through federal health care benefit programs, in violation of 31 U.S.C. §§3729 et seq.

75. The Defendants' knowingly false records or false statements were material, and continue to be material, to the false and fraudulent claims for payments or reimbursement they made and

continue to make to the United States through federal health care benefit programs, including Medicare, Medicaid and Tricare.

76. The Defendants' false records or false statements were made, used or caused to be made or used, and continue to be made, used and caused to be made and used, with the Defendants' actual knowledge of their falsity, or with reckless disregard or deliberate ignorance of whether or not they were false.

77. The United States relied on these false records or false statements, was ignorant of the truth regarding these claims, and would not have paid the Defendants for claims based upon these false records or false statements had it known the truth of the falsity of the said records or statements made by Defendants.

78. Defendants' making false records or false statements, as described herein, is part of a company-wide, systematic pattern and practice of knowingly submitting or causing to be submitted claims to the United States through federal health care benefit programs based upon false records or false statements.

79. That the false records or false statements submitted to the federal government for hospice, assisted living and skilled nursing services were directed, authorized, approved and ratified by all Defendants named herein

80. As a direct and proximate result of the materially false records or statements, and the related false or fraudulent claims made by Defendants, the United States has suffered damages, and therefore, is entitled to treble damages, civil penalties, and all other relief available under the False Claims Act, 31 U.S.C. §§3729 et seq.

**THIRD CAUSE OF ACTION**
**CONSPIRACY**
**(FALSE CLAIMS ACT, 31 U.S.C. §3729(a)(1)(C))**

81. Plaintiff- Relators hereby incorporate, repeat and reallege all paragraphs of this Second Amended Complaint set forth above as if fully set forth herein.

82. The Defendants knowingly combined and conspired, and have knowingly aided and abetted each other, in the commission of violations of the False Claims Act, as more fully set forth herein.

83. In a conspiracy and in furtherance thereof, the Defendants knowingly presented, or caused to be presented, and continue to present or cause to be presented, false and fraudulent claims for payment or approval to the United States through federal health care programs, including Medicare, Medicaid and Tricare.

84. In a conspiracy and in furtherance thereof, the Defendants knowingly made, used or caused to be made or used, and continue to make, use and cause to be made or used, false records or false statements material to the foregoing false or fraudulent claims in order to get these false or fraudulent claims or paid or approved by the United States Government through federal health care benefit programs.

85. In a conspiracy and in furtherance thereof, the Defendants/conspirators acted knowingly in the foregoing overt acts of making, using and presenting false and fraudulent claims, statements, and records, or acted with reckless disregard or deliberate ignorance of whether or not the claims, statements and/or records were false and fraudulent, and continue to do so.

86. Defendants, in concert with one another, their principals, agents and employees, did agree to submit such false claims to the United States Government.

87. Defendants and/or their principals, agents and employees, did act, by and through the conduct described herein, in furtherance of the agreement to submit false claims to the United States Government.

88. Defendants and/or their principals, agents and employees, acted with the intent to defraud the United States by submitting false claims for payment or reimbursement through federal health care programs.

89. As a direct and proximate result of this combination and conspiracy by, between and among Defendants, who each aided and abetted the other Defendants in furtherance of the conspiracy, the United States has suffered damages, and therefore is entitled to treble damages, civil penalties, and all other relief available.

## FOURTH CAUSE OF ACTION
## RETALIATORY DISCHARGE
## (FALSE CLAIMS ACT, 31 U.S.C. §3730(h))

90. Plaintiff- Relators hereby incorporate, repeat and reallege all paragraphs of this Second Amended Complaint set forth above as if fully set forth herein.

91. From April 11, 2012 through August 23, 2012, Plaintiff Relator Michaels was an employee of Agape Senior, LLC, working in the position of RN Case Manager in the Rock Hill-based hospice program.

92. During the course of such employment, Relator Michaels obtained personal knowledge of the foregoing fraudulent conduct of the Defendants.

93. When Relator Michaels refused to follow the illegal mandate of her superiors regarding her at-home patient [JT], she was disciplined and ultimately terminated. Her patient's medical condition required a higher level of medical care for his acute condition unrelated to his terminal diagnosis of lung cancer. In addition, the patient and his caretaker requested and desired treatment at the hospital. However, the superiors of Relator Michaels instructed her that he be admitted to Defendant Agape N & R skilled nursing facility for GIP care, for which Defendants would receive a higher level of payment, instead of having to pay the

hospital for the care provided and losing the enrollment of the patient in their hospice program.

94. This patient [JT] was admitted to the hospital, diagnosed with double pneumonia and had to be transferred to another hospital for specific testing.

95. Relator Michaels was called to come to the office the day after this patient [JT] was admitted to the hospital to discuss what had happened. After a brief meeting, she was sent home and placed on suspension with no reason or explanation provided.

96. The day after that initial meeting, Relator Michaels was instructed to return to the home office for another meeting. At that meeting, her supervisors terminated her employment on the pretext that Relator Michaels rolled her eyes in the meeting.

97. In reality, Defendant Agape Senior, LLC, along with the other Defendants named herein, by and through their officers, agents, representatives and employees, unlawfully discriminated against Relator Michaels with respect to the terms and conditions of her employment, including, but not limited to, unlawfully discharging Relator Michaels as a direct and proximate result of, and in retaliation for, her lawful whistleblower acts to stop one or more of the Defendants' violation of the False Claims Act and demonstrating her unwillingness to follow the mandates of her superiors that were in violation of federal statutes, professional ethics as well as the patient's wishes and best interest.

98. Defendant Agape Senior, LLC also has repeatedly given unwarranted and false negative statements and opinions regarding Relator Michaels to prospective employers, including, but not limited to, stating that she was not eligible for rehire contrary to their conversation with Relator Michaels, thus depriving her of significant subsequent employment opportunities.

99. As a direct and proximate result of the Defendant Agape Senior, LLC's wrongful termination of Relator Michaels' employment in retaliation for her whistleblowing activities, she has suffered damages, and therefore is entitled to all relief necessary to make her whole, including, but not limited to, two times the amount of back pay, interest on the back pay, and compensation for special damages resulting from the retaliatory discharge, including litigation costs and reasonable attorneys' fees.

## FIFTH CAUSE OF ACTION
## WRONGFUL DISCHARGE IN VIOLATION OF PUBLIC POLICY

100. Plaintiff- Relators hereby incorporate, repeat and reallege all paragraphs of this Second Amended Complaint set forth above as if fully set forth herein.

101. That the wrongful termination of Relator Michaels' employment was Defendant Agape Senior LLC's response to her objections to the improper and illegal practices of Defendants, as set forth herein.

102. That the wrongful discharge of Relator Michaels by Defendant Agape Senior, LLC violates South Carolina and the United States laws against retaliatory dismissal and was, in fact, retaliatory in nature and the stated reason for her discharge was a pretext for the actual reason for her discharge which was her protected and lawful whistleblowing activities as well as her actions in the best interest of a patient's health and in accordance with his wishes.

103. The wrongful discharge of Relator Michaels' employment by Defendant Agape Senior, LLC constitutes a violation of a clear mandate of public policy of the State of South Carolina to protect employees from wrongful discharge when said employees report, complain about, and/or otherwise oppose fraudulent, illegal activities by the employer.

104. As a direct and proximate result of Defendant Agape Senior, LLC's wrongful termination of Relator Michaels' employment, she has suffered damages, and therefore is entitled to recover both actual and punitive damages in such amount as a jury may award.

## SIXTH CAUSE OF ACTION
## ANTI-KICKBACK STATUTE VIOLATIONS
### (42 U.S.C. §1320a-7b et seq.)

105. Plaintiff- Relators hereby incorporate, repeat and reallege all paragraphs of this Second Amended Complaint as if fully set forth herein.

106. Defendants, by or through their agents, officers or employees, have and are still knowingly and willfully making or causing to be made false statements or representations of material facts in applications for benefits or payments under federal health care programs, in violation of the Anti-Kickback Statute as set forth more fully herein.

107. That Defendants, by or through their agents, officers or employees, have and are still knowingly and willfully making or causing to be made false statements or representations of material facts for use in determining rights to federal health care program benefits or payments in violation of the Anti-Kickback Statute as set forth more fully herein.

108. That Defendants, by or through their agents, officers or employees, have and continue to have knowledge of and conceal or fail to disclose events affecting patients' initial and/or continued rights to federal health care program benefits or payments of patients on whose behalf they have applied for and/or received such benefits or payments with an intent to fraudulently secure such benefits in violation of the Anti-Kickback Statute as set forth more fully herein.

109. That Defendants, by or through their agents, officers or employees, have and continue to knowingly and willfully offer or pay any remuneration directly or indirectly, overtly or

covertly, in cash or in kind to any person to induce him to refer an individual to a person for the furnishing or arranging for the furnishing of any item or service for which payment may be made in whole or in part under a federal health care program in violation of the Anti-Kickback Statute as set forth more fully herein.

110. That Defendants, by or through their agents, officers or employees, have and continue to knowingly and willfully offer or pay any remuneration directly or indirectly, overtly or covertly, in cash or in kind to any person to induce him to purchase, lease, or order any good, facility, service, or item for which payment may be made in whole or in part under a federal health care program in violation of the Anti-Kickback Statute as set forth more fully herein.

111. That Defendants, by or through their agents, officers or employees, have and continue to knowingly and willfully make or cause to be made, or induce or seek to induce the making of, any false statement or representation of material facts with respect to the conditions or operation of any institution, facility or entity in order that such may qualify as an entity for which certification is required under any federal or state health care program, as set forth more fully herein.

112. That Defendants, by or through their agents, officers or employees, have and continue to knowingly and willfully offer or pay any remuneration directly or indirectly, overtly or covertly, in cash or in kind to any person to induce him to purchase, lease, or order any good, facility, service, or item for which payment may be made in whole or in part under a federal health care program in violation of the Anti-Kickback Statute as set forth more fully herein.

113. As a direct and proximate result of the Defendants' violations of the federal Anti-Kickback Statute, the United States has suffered damages, and therefore, is entitled to all criminal and civil penalties, and all other relief available under the Anti-Kickback Statute.

## SEVENTH CAUSE OF ACTION
## HEALTH CARE FRAUD STATUTE VIOLATIONS
## (18 U.S.C. §1347)

114. Plaintiff- Relators hereby incorporate, repeat and reallege all paragraphs of this Second Amended Complaint as if fully set forth herein.

115. That Defendants, by or through their agents, officers or employees, have and continue to knowingly and willfully execute, or attempt to execute, a scheme or artifice to defraud any health care benefit program in violation of the Health Care Fraud statute, as set forth more fully herein.

116. That Defendants, by or through their agents, officers or employees, have and continue to knowingly and willfully execute, or attempt to execute, a scheme or artifice to obtain by means of false or fraudulent pretenses, representations or promises, any of the money or property owned by, or under the custody or control of any health care benefit program in connection with the delivery of or payment for health care benefits, items, or services in violation of the Health Care Fraud statute, as set forth more fully herein.

117. As a direct and proximate result of the Defendants' violations of the federal Health Care Fraud Statute, the United States has suffered damages, and therefore, is entitled to all criminal and civil penalties, and all other relief available under the Health Care Fraud Statute.

## EIGHTH CAUSE OF ACTION
## FRAUD, SUPPRESSION AND DECEIT

118. Plaintiff- Relators hereby incorporate, repeat and reallege all paragraphs of this Second Amended Complaint set forth above as if fully set forth herein.

119. Defendants misrepresented or suppressed the material fact that a substantial number of its patients enrolled in their hospice do not qualify for hospice benefits under federal health care

benefit programs and are not terminally ill.

120. Defendants were under an obligation to communicate to the United States that it had enrolled patients to receive hospice benefits and that it had billed the United States for service to patients who do not qualify for hospice benefits under federal health care benefit programs and are not terminally ill.

121. Such misrepresentations were made willfully to deceive or recklessly without knowledge. The United States acted on Defendants' material representations, as described herein, to its detriment.

## VII. PRAYER FOR RELIEF

122. Wherefore, Plaintiff-Relators respectfully request this Court to enter judgment against Defendants, jointly and severally, as follows:

   a. That the United States be awarded treble the amount of damages sustained because of Defendants' fraudulent activity and submission of false claims;

   b. That maximum civil penalties be imposed for each and every false claim presented or caused to be presented to the United States by Defendants;

   c. That pre-judgment and post-judgment interest be awarded;

   d. That the Court grant permanent injunctive relief to prevent any recurrence of the False Claims Act violations alleged herein;

   e. That the Plaintiff-Relators be awarded the maximum amount allowed in the False Claims Act;

   f. That reasonable attorneys' fees, costs and expenses, which the Plaintiff-Relators necessarily incurred in bringing and pursuing this action, be awarded.

g.  That wrongful termination damages be awarded to Relator Michaels for her discriminatory and retaliatory discharge in the amount of two times the amount of back pay and benefits that she would have earned, interest on the back pay, front pay and benefits lost, litigation costs,

h. reasonable attorneys' fees, actual, special and punitive damages; and

i. That the Court award such other and further relief as it may deem just and proper.

Dated: March 6, 2014                              Respectfully submitted,

                                                  RICHARDSON, PATRICK,
                                                  WESTBROOK & BRICKMAN, LLC

                                                  s/ T. Christopher Tuck                    .
                                                  T. Christopher Tuck, Fed ID # 9135
                                                  ctuck@rpwb.com
                                                  1037 Chuck Dawley Blvd. Bldg. A
                                                  Mt. Pleasant, South Carolina 29464
                                                  (843) 727-6500 Phone
                                                  (843) 216-6509 Facsimile

                                                  Terry E. Richardson, Jr., Fed ID # 3457
                                                  trichardson@rpwb.com
                                                  Dan S. Haltiwanger, Fed ID #7544
                                                  dhaltiwanger@rpwb.com
                                                  P.O. Box 1368
                                                  Barnwell, SC  29812
                                                  (888) 705-1619 Phone
                                                  (803) 541-9625 Facsimile

                                                  CHRISTY DELUCA, LLC
                                                  Christy M. DeLuca, Fed ID # 7309
                                                  christy@christydeluca.com
                                                  3253 Sand Marsh Lane
                                                  Mount Pleasant, SC  29466
                                                  (843) 834-1289 Phone

                                                  ATTORNEYS FOR PLAINTIFFS

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on the 6[h] day of March, 2014, I caused the foregoing document to be electronically filed with the Clerk of the Court using CM/ECF, which will provide electronic notice of such filing to all counsel of record.


s/ T. Christopher Tuck              .
T. Christopher Tuck