IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF SOUTH CAROLINA
ROCK HILL DIVISION

| | |
|---|---|
| United States of America *ex rel.*, Brianna Michaels and Amy Whitesides, ) ) ) | C/A No. 0:12-3466-JFA |
| Plaintiff-Relators, ) ) | ORDER RESOLVING TWO INTERRELATED ISSUES AND |
| v. ) ) ) | CERTIFICATION FOR INTERLOCUTORY APPEAL |
| Agape Senior Community, Inc.; Agape Senior Primary Care, Inc.; Agape Senior Services, Inc.; Agape Senior, LLC; Agape Management Services, Inc.; Agape Community Hospice, Inc.; Agape Nursing and Rehabilitation Center, Inc. d/b/a Agape Rehabilitation of Rock Hill a/k/a Agape Senior Post Acute Care Center – Rock Hill a/k/a Ebenezer Senior Services, LLC; Agape Senior Foundation, Inc.; Agape Community Hospice of Anderson, Inc.; Agape Hospice of the Piedmont, Inc.; Agape Community Hospice of the Grand Strand, Inc.; Agape Community Hospice of the Pee Dee, Inc.; Agape Community Hospice of the Upstate, Inc.; Agape Hospice House of Horry County, Inc.; Agape Hospice House of Laurens, LLC; Agape Hospice House of the Low Country, Inc.; Agape Hospice House of the Piedmont, Inc.; Agape Rehabilitation of Conway, Inc.; Agape Senior Services Foundation, Inc.; Agape Therapy, Inc.; Agape Hospice; Hospice Piedmont; Hospice Rock Hill; and Carolinas Community Hospice, Inc., ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) | PURSUANT TO 28 U.S.C. § 1292(b) |
| Defendants. ) ) | |
| _____ ) | |

1

On December 7, 2012, this *qui tam* action was initiated by Brianna Michaels and Amy Whitesides (the "Plaintiff-Relators") on behalf of themselves and the United States of America (the "Government") claiming damages and other relief under the civil False Claims Act, 31 U.S.C. § 3729, *et seq.*, the Anti-Kickback Statute, 42 U.S.C. § 1320a-7b, *et seq.*, and the Health Care Fraud Statute, 18 U.S.C. § 1347.  The Government declined to intervene as a plaintiff in this action on March 5, 2013.

The Plaintiff-Relators were formerly employed at one or more of the institutions operated by the Defendants.  The Defendants (collectively referred to herein as "AGAPE") consist of a network of twenty-four nursing homes located throughout South Carolina, each containing some form of "AGAPE" in their names.  The Plaintiff-Relators allege that AGAPE orchestrated a widespread fraudulent scheme of submitting false claims to the federal healthcare programs of Medicare, Medicaid, and Tricare, seeking reimbursement for nursing home-related services.

At the risk of oversimplification, it can be stated that the claims asserted in this action center primarily on two types of reimbursements sought by AGAPE from the federal healthcare programs:  payments related to hospice care, and payments related to what are known as "general inpatient services."  As with virtually ever aspect of this case, the Plaintiff-Relators and AGAPE disagree on the total number of patients involved and the total number of claims submitted by those patients.  Regardless of who is correct on this issue, the total number of claims involved in the trial will be staggering.  AGAPE contends that there were 19,820 patients admitted to AGAPE's facilities during the applicable time period for

whom approximately 53,280 claims were submitted. Plaintiff-Relators contend that the patient population is only 10,166 patients, who filed a total of 61,643 claims. In any event, Plaintiff-Relators' counsel represents to the Court that they have retained two experts, each of whom receives $400 per hour for file review. These experts estimate they spend between four and nine hours reviewing each patient's chart. Thus, the review of a single patient's services would cost between $1,600 and $3,600 dollars. Using the conservative figure submitted by Plaintiff-Relators (10,166 patients), this means that the total outlay for expert file review (not including depositions, trial testimony, and the like) is between $16.2 million and $36.5 million.[1]

During discovery, it became necessary for the Court to rule on a pivotal issue regarding damages in the case. The issue involved the question of whether Plaintiff-Relators would be able to prove damages by using a statistical sampling method. This particular method would involve the careful examination of a specified percentage of randomly selected claims. If it could be proven that a certain percentage of those claims were in fact fraudulent, then Plaintiff-Relators would project that percentage on the total universe of claims submitted by AGAPE to the Government. This issue arose during discovery when the parties became engaged in a controversy regarding the designation of expert witnesses and the methodology to be used by those witnesses. It appeared to both the Court and the parties that a ruling on this critical threshold issue would significantly impact the parties' preparation for trial. Therefore, the Court received briefing on the issue, heard argument

---

[1] The precise figures are: at $1,600 per patient = $16,265,600; at $3,600 per patient = $36,597,600.

thereon, and concluded that it would not allow the Plaintiff-Relators to use statistical sampling in determining damages.

Shortly thereafter, the Court suggested that the parties consider conducting a "bellwether" trial as to 100 of the allegedly false claims. In a bellwether trial, a sample of cases large enough to yield reliable results is tried to a jury, after which the remainder of the case is tried to a separate jury. The outcome of the bellwether trial can often be beneficial for litigants who desire to settle such claims by providing information on the value of the remainder of the case as reflected by the jury verdict in the bellwether trial.

Use of a bellwether trial is particularly appropriate in this case because unlike large class actions, which most often involve a significant degree of overlap regarding common factual issues, each and every claim at issue in this case is fact-dependent and wholly unrelated to each and every other claim. For this reason, the representative sample of the claims associated with a smaller number of patients may easily be selected for a separate trial because those claims, and the claims asserted in the remainder of the case, are independent of each other.

Both parties agreed to this approach, and claims relating to 95 AGAPE patients were identified for the bellwether trial. Plaintiff-Relators later voluntarily reduced this number to 38 patients. The bellwether jury trial was scheduled to begin May 5, 2015.

On November 25, 2014, the parties and the Government engaged in mediation efforts. In early January 2015, shortly before all expert reports were due, the parties again engaged in mediation, this time before United States Magistrate Judge Mary Gordon Baker. In the

first mediation session, both the Government and the Plaintiff-Relators were allowed to participate. In the second mediation, the Government was not invited and did not participate.

In mid-January, the parties informed the Court that a settlement had been reached as to the entire case, with AGAPE paying the sum of ███████████████████████████████████████████████████████████████████████████.

The Government promptly signaled its intention to object to the settlement, relying upon a statute, 31 U.S.C. § 3730(b)(1), which on its face gives the United States Attorney General the right to prevent a settlement even in a case where the Government has declined to intervene.

After the Government objected, the Court conducted several status conferences in an effort to see if there could be some type of amicable resolution to the matter. When these conferences proved unsuccessful, AGAPE moved to enforce the settlement. The Court heard extensive oral argument on AGAPE's motion (ECF No. 263) on June 16, 2015. The motion squarely presented the question of whether the Attorney General has an absolute, unreviewable veto over the settlement of False Claims Act cases for which the Government has declined to intervene.

During the aforementioned status conferences and during the debate on the motion to enforce the settlement, it became clear that the basis for the objection by the Government was its belief that the total potential damages to the Government in this case would be around $25 million. The Government posits that the proposed settlement—representing █ percent of what the Government believes is the potential recovery at trial—is insufficient. The

5

Government arrived at its potential recovery figure by using an "error rate" in the "20–60% range" derived from an expert review of what the Government refers to as "cherry picked" claims. While the Government's methodology for evaluating this case is not altogether clear to this Court, suffice it to say that the Government has used some form of statistical sampling extrapolated to the universe of potential claims in its damages calculation.

The Court is thus faced with a unique dilemma: The Government, claiming an unreviewable veto right over the tentative settlement in this case, objects to a settlement in a case to which it is not a party, using as a basis of its objection some form of statistical sampling that this Court has rejected for use at the trial of the case. It thus appears that these two issues—the question of veto authority of the Government, coupled with this Court's rejection of the statistical sampling model—should be certified for interlocutory appeal before the parties embark upon what could be a trial stretching as long as one year or more.

For the foregoing reasons, the Court will set out in this Order its rationale for denying AGAPE's motion to enforce the settlement, thus recognizing the Government's unreviewable veto authority, and disallowing statistical sampling as a method of proving liability or damages.

### *The Government's Rejection of the Proposed Settlement*

The False Claims Act, 31 U.S.C. § 3729 *et seq*. ("FCA"), provides that "[An FCA *qui tam* action] may be dismissed only if the court *and the Attorney General* give written consent to the dismissal and their reasons for consenting." (emphasis added). The unambiguous language of § 3730(b)(1) thus makes the consent of the Attorney General a prerequisite to

the dismissal of an FCA action pursuant to a settlement between a relator and a defendant. The statute provides no limitation on the Attorney General's authority, and no right of this Court to review the Attorney General's objection for reasonableness. The Supreme Court has stated time and time again that "courts must presume that a legislature says in a statute what it means and means in a statute what it says there." *Dept. of Defense v. FLRA*, 510 U.S. 487, 503 (1994).

The only circuit court that has held that the Government's consent is not required after the Government declines to intervene in a case is the Ninth Circuit in *United States ex rel. Killingsworth v. Northrup Corp.*, 25 F.3d 715 (9th Cir. 1994). In *Killingsworth*, the Ninth Circuit held that the Government has unreviewable veto authority of a settlement only during the 60-day period following the filing of a *qui tam* action, during which the Government has the opportunity to elect whether to intervene. After that, according to the Ninth Circuit, the Government's veto over a *qui tam* action in which it has not intervened is subject to a reasonableness review by the court in which the action is pending. Since that decision, every circuit court to address the issue has expressly rejected *Killingsworth*.

In *United States ex rel Searcy v. Philips Electronics N. Am. Corp.*, 117 F.3d 154, 159 (5th Cir. 1997), the Fifth Circuit found that "[t]he statutory language relied on by the government is as unambiguous as one can expect," and noted that "[u]nlike the *Killingsworth* court, we can find nothing in § 3730 to negate the plain import of this language." *Id*. Likewise, in *United States v. Health Possibilities*, *P.S.C.*, 207 F.3d 335, 339 (6th Cir. 2000), the Sixth Circuit agreed with the *Searcy* court and held that a *qui tam* action cannot be settled

7

without the consent of the Government, even if the Government has declined to intervene. The Sixth Circuit noted that "[i]f Congress wanted to limit the consent requirement to the period before the United States makes its initial intervention decision, we presume that it knew the words to do so." *Id*. The court further stated:

> "[t]here is absolutely no statutory authority for the proposition that simply because the government decides not to expend the resources to proceed with an action itself, it thereby authorizes the relator to settle the government's claims in whatever manner he wishes. Indeed, such a construction would only force the government to unnecessarily intervene in *qui tam* cases and thereby frustrate the efficacy of the *qui tam* framework."

*Id*. at 343 n.6.

The state of the law on this issue was concisely summarized in a recent district court decision, which also sided with the Fifth and Sixth Circuits. *United States ex rel. Landis v. Tailwind Sports Corp.*, ___ F. Supp. 3d ___, No. 1:10-CV-00976 (CRC), 2015 WL 1623282 (D.D.C. Apr. 9, 2015). In *Tailwind*, the court declined to enforce a settlement over the Government's objection. In doing so, the court stated "[w]hile it might seem unfair for the Government to be able to force a relator to continue to litigate non-intervened claims that he would prefer to settle, the broader purposes of the FCA are served, at least to some extent, by a plain reading of section 3730's consent provision." *Id.* at *2. The court went on to note that, "*Killingsworth* has not fared well in the intervening years," that "[i]ts conclusion and reasoning have been expressly rejected by both the Fifth and Sixth Circuits," and that, "while neither the Supreme Court nor the D.C. Circuit has tackled the question head-on, both have indicated that the Government's consent is required for the voluntary dismissal of

non-intervened claims." *Id*. (citing *United States ex rel. Eisenstein v. City of New York*, 556 U.S. 928, 932 (2009), and *Hoyte v. Am. Nat'l Red Cross*, 518 F.3d 61, 63 n.2 (D.C. Cir. 2008)).

The *qui tam* Plaintiff-Relators and AGAPE, former adversaries, have now joined together to urge the Court to accept the rationale employed in *Killingsworth*. They argue that because the Government declined to intervene in this case, any objection lodged by the Attorney General to the proposed settlement must be reviewed for reasonableness by this Court. And, according to these two former adversaries, the Government's position opposing the settlement is patently unreasonable, especially in light of the forecast by the Plaintiff-Relators that expert witness fees necessary to develop this case are between $16.2 and $36.5 million[2] for a case in which the potential recovery, according to the Government, is around $25 million. Furthermore, the parties point out, that the Government has not offered to come forward to underwrite the cost of these expert witnesses in the forthcoming trial.

Because the statute under consideration is plain on its face and contains no limitation on the Attorney General's authority to object to a settlement in a *qui tam* action, even one in which the Government has not joined, the Court is constrained to deny the motion to enforce the settlement. In so doing, the Court adopts the rationale employed by the Fifth and Sixth Circuits in full and rejects the analysis provided in *Killingsworth*.

---

[2] As noted previously, the figures cited involve pretrial file review only; they do not include time for depositions and trial testimony.

Having made this determination, this Court's inquiry is at an end. It bears mention, however, that if this Court did have the authority to review an objection by the Attorney General for reasonableness in a case of this nature, a compelling case could be made here that the Government's position is not, in fact, reasonable.

As noted previously, this action has been pending since 2012. The primary attorneys for the *qui tam* Plaintiff-Relators, Terry E. Richardson, Jr., and J. Preston Strom, Jr., are both seasoned federal litigators, each having extensive experience practicing before this Court (more than 40 years for Mr. Richardson and more than 30 years for Mr. Strom, during which Mr. Strom served for several years as the United States Attorney for the District of South Carolina). They both have handled numerous class actions involving highly complex issues and national implications. Their firms are large enough to be equipped to handle the extensive discovery and myriad administrative matters presented by a case of this nature. To use the vernacular, they have both been around the litigation table long enough to "know when to hold 'em, [and] know when to fold 'em." For these reasons, the Court should not cavalierly reject their wise counsel regarding their valuation of this case.

Moreover, as noted above, this case presents between 53,000 and 61,000 individual non-related claims, each involving a fact intensive examination of the medical charts of between 10,000 and 20,000 nursing home patients. According to AGAPE, these files contain opinions of a treating physician and an in-house staff physician attesting to the medical need for the claim submitted to the Government in this case. AGAPE indicates that it may call as many as 65 physicians to testify at trial. For this reason, it will be necessary for the Plaintiff-

Relators to counter this expert physician testimony with an expert of their own, and it has been reported to this Court that the expert retained has estimated that it would require up to nine hours of review of each individual patient's file, at the rate of $400 per hour, to adequately prepare for all of the claims in this case. If this is true, the Plaintiff-Relators could be looking at an expenditure of between $16.2 million and $36.5 million in pretrial preparation alone for a case that the Government values at $25 million. The additional time required for expert depositions and trial testimony would easily push the expenses of the trial above the Government's assessment of the value of this case. And, as noted herein, at oral argument, the Government was steadfast that it should not be required to underwrite any of the costs of going forward with the trial that it demands take place.

AGAPE points to another factor which, although of less significance, bears mention here. Although the Government has not intervened in this case, it has been an active participant in the litigation from the beginning. On March 12, 2013, shortly after the Government declined to intervene in this action, a second case—*Susan Rush, et al. v. Agape Senior, LLC, et al.*, [3:13-666-JFA (D.S.C.)]—was filed in this District asserting many of the same claims asserted in this action. In *Rush*, the Government requested and received several extensions of time within which to investigate the case for the purposes of deciding whether to intervene. During this period, the Government interviewed numerous employees of AGAPE, obtained thousands of documents pursuant to Civil Investigative Demands, and opened a criminal investigation to run parallel to the civil investigation. In the *Rush* case, the Government requested permission to unseal the complaint to reveal the existence of the

second *qui tam* action to Plaintiff-Relators Michaels and Whitesides in this case. That request by the Government prompted a barrage of motions by the parties in the first and second cases, each seeking to have the other dismissed on "first to file" and "public disclosure" grounds.

After the Court resolved those disputes by dismissing the *Rush* case, the Government remained actively involved in this case, attending court hearings, taking positions on various procedural matters, filing briefs on substantive issues to be decided by this Court, attending depositions, and requesting extensions of time.

AGAPE points out that even with the Government's extensive involvement in this case as outlined above, when pressed to be more specific as to how the Attorney General arrived at the potential verdict of $25 million, the Government has declined to provide its calculations, suggesting that it is not a party to this case and is under no obligation to respond to discovery requests. The Court has reluctantly agreed with the Government that it should not be required to respond to AGAPE's motion for a precise calculation of damages, but it should be noted that, as indicated above, the Government has admitted that statistical sampling of the entire universe of claims played a major part in its calculation of the value of this case.

### *Plaintiff-Relators' Use of Statistical Sampling in Proving Liability and Damages*

As noted previously, this issue—which in most cases would be a trial-related issue raised shortly before or during trial—presented itself to this Court when the parties became embroiled in a controversy regarding the opinions given by their respective expert witnesses.

Because the question presented was a pure question of law, not dependent upon subsequent discovery, the Court proceeded to receive briefing and heard argument on the use of statistical sampling. The Court rejected the use of this damages model and held that the Plaintiff-Relators would be required to prove each and every claim based upon the evidence relating to that particular claim. The Court's rationale is as follows.

The question whether to allow the Plaintiff-Relators to prove damages using statistical sampling that has been recognized by some courts is by far the most difficult one presented in this case. After carefully canvassing the decisions on each side of the issue, and giving careful consideration to the nature of the claims asserted here, the Court has ultimately determined that statistical sampling should not be allowed.

At the outset, it should be noted that this case is not one where the evidence has dissipated, thus rendering direct proof of damages impossible. Indeed, this Court recently handled a totally unrelated *qui tam* action where statistical sampling represented the only way the plaintiff-relators could prove damages. In that case, the allegations were that a company employed to move the household belongings of army personnel had submitted fraudulent claims to the government by artificially bumping the weight of each shipment so as to fraudulently increase the amount charged for the shipment. Two employees of the defendant came forward to report the alleged weight bumping, and a quick investigation revealed some discrepancies with shipments then in process. The problem in that case, however, was that for the vast majority of the claims, the shipments had been completed and

the belongings unpacked, thus rendering it impossible to determine if weight bumping had occurred.

Moreover, the defendant had also packed, shipped, and stored on a long-term basis, the household belongings of military personnel overseas. This provided the parties with the opportunity to sample those long-term storage units and, assuming that the sampling was supported by appropriate expert testimony, extrapolating the percentage of weight bumping discovered in the sample to the universe of claims filed by the defendant.

That case settled before the Court was given the opportunity to rule on the statistical sampling question, but it suffices for an illustration of why statistical sampling is sometimes the only way for a *qui tam* plaintiff-relator to prove damages. To disallow statistical sampling in cases of that nature would allow widespread fraud to go unpunished.

By contrast, nothing has been destroyed or dissipated in this case. The patients' medical charts are all intact and available for review by either party.

In *United States v. Friedman*, No. 86-0610-MA, 1993 U.S. Dist. LEXIS 21496 (D. Mass. July 23, 1993), the court declined to allow statistical sampling "based on the existence at trial of discrete claims that may be analyzed, discussed, and subjected to cross-examination." This Court agrees with the analysis provided by the District Court in *Friedman*.

AGAPE has cited numerous cases where a court refused to allow statistical sampling and extrapolation to prove damages or liability in an FCA action. *See United States ex rel. Crews v. NCS Healthcare of Illinois, Inc.*, 460 F.3d 853, 857 (7th Cir. 2006) (rejecting

relator's attempt to establish FCA liability based upon percentages rather than proof of actual false claims); *United States ex rel. El-Amin v. George Washington Univ.*, 533 F. Supp. 2d 12, 31 n.9 (D.D.C. 2008) (requiring the relators to set forth specific evidence for each individual claim); *United States ex rel. Hockett v. Columbia/HCA Healthcare Corp.*, 498 F. Supp. 2d 25, 66 (D.D.C. 2007) (court held that it is "imperative for [R]elator[s] to produce real evidence to support [their] contention[s]. . . ."); *United States v. Medco Physicians Unlimited*, No. 98-C-1622, 2000 U.S. Dist. LEXIS 5843, at *23 (N.D. Ill. Mar. 15, 2000) (declining to allow statistical sampling and explaining that the parties provided "no case law or other authority to support such a request"); *United States ex rel. Trim v. McKean*, 31 F. Supp. 2d 1308, 1314 (W.D. Okla. 1998) (declining to allow a statistical sample "to find a percentage of false claims from *all* claims submitted by [defendant] . . . .").

In contrast, the Plaintiff-Relators and the Government provided a number of cases where a court permitted statistical sampling and extrapolation to prove damages (and sometimes liability) in an FCA action.[3]  *United States v. Rogan*, 517 F.3d 449, 453 (7th Cir.

---

[3] Other cases exist outside the realm of *qui tam* actions. The Government cites to a number of cases to support statistical extrapolation for the recoupment of Medicare overpayments; however, the Court is unpersuaded by the cited recoupment cases because each case involved a Government audit that established the amount of overpayments. *Illinois Physicians Union v. Miller,* 675 F.2d 151, 152 (7th Cir. 1982); *Webb v. Shalala*, 49 F. Supp. 2d 1114, 1125 (W.D. Ark. 1999).

Health Care Financing Administration Ruling 86-1 "provides for the use of statistical sampling to project overpayments when claims are voluminous and reflect a pattern of erroneous billing or over-utilization and when a case-by-case review is not administratively feasible." *Webb*, 49 F. Supp. 2d at 1120 (citing HCFA Ruling 86-1). When a provider receives Medicare reimbursements, the provider agrees to allow the government to audit these payments in order to "identify and correct Medicare improper payments through the efficient detection and collection of overpayments made on claims of health care services provided to Medicare beneficiaries." *Recovery Audit Program*, CENTERS FOR MEDICARE & MEDICAID SERVICES, http://www.cms.gov/Research-Statistics-Data-and-Systems/Monitoring-Programs/Medicare-FFS-Compliance-Programs/Recovery-Audit-Program/ (last visited June 23, 2015).

15

2008) (appellate court rejected the argument that the district court had to address each of the 1,812 claims at issue and held that "[s]tatistical analysis should suffice;" however, all 1,812 claims were objectively false); *United States ex rel. Ruckh v. Genoa Healthcare, LLC*, No. 8:11-CV-1303-T-23TBM, 2015 WL 1926417, at *3 (M.D. Fla. Apr. 28, 2015) (district court expressed an inclination to allowing statistical sampling and extrapolation by rejecting *Friedman* and explaining that *Friedman* does not stand for the proposition that statistical sampling cannot be used in large-scale *qui tam* cases); *United States ex rel. Martin v. Life Care Ctrs. of Am., Inc.,* Nos. 1:08-cv-251, 1:12-cv-64, 2014 U.S. Dist. LEXIS 142660 (E.D. Tenn. Sept. 29, 2014) (same); *United States v. Fadul,* No. CIV.A.DKA 11-0385, 2013 WL 781614, at *2 (D. Md., Feb., 28, 2013) (finding the extrapolation method acceptable for Medicare and Medicaid claims under common law theory of payment by mistake); *United States v. Chen*, No. 2:04-cv-00859, 2009 WL 1683142 (D. Nev. 2009) (jury found physician liable under the FCA for submitting 3,544 false claims, but parties only analyzed 37 claims at trial after the physician conceded that the referral request and services provided were the same for each of these claims); *United States ex rel. Loughren v. UnumProvident Corp.*, 604 F. Supp. 2d 259, 263 (D. Mass. 2009) (extrapolation is a reasonable method for determining the number of false claims so long as the statistical

---

Sampling used in the administrative context of a recoupment case is distinct from using sampling to prove an FCA claim. In a recoupment action by an administrative agency, the burden is on the recipient to prove entitlement to monies and recovery is limited to the amount overpaid and interest. The FCA places the burden of proof on the relator under 31 U.S.C. § 3731(d); the defendant is liable for up to three times the amount of damages proven by the relator plus civil penalties for each false claim under 31 U.S.C. § 3729(a)(1)(G). The bottom line of the relied upon recoupment cases is that the Government audit on the claims essentially established false claim liability in any subsequent *qui tam* action.

methodology is appropriate); *United States ex rel. Barron v. Deloitte & Touche, LLP*, Civil No. SA-99-CA-1093-FB, 2008 WL 7136869, *2 (W.D. Tex. Sept. 26, 2008) (in a *Daubert* hearing, the court excluded the statistician's testimony, but recognized the relevance of statistical evidence); *United States ex rel. Doe v. DeGregorio*, 510 F. Supp. 2d 877, 890 (M.D. Fla. 2007) (court relied on an extrapolated overpayment figure derived from a prior Government audit when calculating the pre-judgment remedy figure in the subsequent FCA action); *United States v. Cabrera-Diaz*, 106 F. Supp. 2d 234, 242 (D.P.R. 2000) (court entered default judgment against defendants for treble the damages sustained based off the estimated overpayments that a prior Government audit revealed); *United States v. Krizek*, 859 F. Supp. 5, 7 (D.D.C. 1994) *supplemented*, 909 F. Supp. 32 (D.D.C. 1995) *aff'd in part and remanded*, 111 F.3d 934 (D.C. Cir. 1997) (physician agreed upon sampling process to prove liability of the 8,002 potentially false claims, appellate court agreed that physician consented to sampling).

As can readily be seen, the cases are legion on each side of the issue, and ultimately, it is this Court's responsibility to determine the fairest course of action based upon the facts presented and the claims asserted in this case. Distilled to its essence, each claim asserted here presents the question of whether certain services furnished to nursing home patients were medically necessary. Answering that question for each of the patients involved in this action is highly fact-intensive inquiry involving medical testimony after a thorough review of the detailed medical chart of each individual patient. As the Court has acknowledged,

some cases are suited for statistical sampling and, indeed, in many cases that method is the only way that damages may be proved. This civil action, however, is not such a case.[4]

### *The Need for Certification of These Two Interrelated Issues*

As can be seen from the discussion in this Order, the question of whether the Government should be allowed to reject a settlement in a case for which it has not intervened, while relying upon a damages model that this Court has rejected for purposes of trial, presents a unique development that cries out for interlocutory appeal in this case. If the Attorney General's objection is overturned by the Court of Appeals and, upon remand, this Court determines that the objection is unreasonable, this case will end with an amicable settlement. If, on the other hand, the Government's veto is upheld by this Court, and the case proceeds without the use of statistical sampling in determining damages, the parties in this action face a trial of monumental proportions, involving a staggering outlay of expenses by the Plaintiff-Relators and a significant drain of the resources of this Court, which would possibly be unnecessary if this Court's determination to reject statistical sampling were to be reversed. It would be much more judicially efficient to have a ruling on both of the questions before, rather than after, such a monumental trial.

---

[4] At oral argument on the motion relating to statistical sampling, Defendants argued that the use of such a procedure would deprive them of their constitutional right to a jury trial. They also served notice that, even if the Court allowed statistical sampling, in their case-in-chief, the Defendants would delve into the medical issues involved in each and every claim for which the Plaintiff-Relators seek recovery, thereby insuring that the statistical sampling would not significantly shorten the trial.

For the foregoing reasons, the Court will certify its ruling on the two questions addressed in this order, to wit: (1) the Government's right to reject a settlement in a *qui tam* action to which it has not intervened; and (2) the Plaintiff-Relators' use of statistical sampling to prove liability and damages, for interlocutory appeal, pursuant to 28 U.S.C. § 1292(b). That statute provides that:

> When a district judge, in making in a civil action an order not otherwise appealable under this section, shall be of the opinion that such order involves a controlling question of law as to which there is substantial ground for difference of opinion and that an immediate appeal from the order may materially advance the ultimate termination of the litigation, he shall so state in writing in such order. The Court of Appeals which would have jurisdiction of an appeal of such action may thereupon, in its discretion, permit an appeal to be taken from such order, if application is made to it within ten days after the entry of the order.

28 U.S.C. § 1292(b).

Pursuant to the above quoted provision of § 1292, this Court hereby certifies that its decision on the two issues addressed in this Order involve a controlling question of law as to which there is substantial ground for difference of opinion, and that an immediate appeal from this Order may materially advance the ultimate termination of this litigation.

The parties are implored to seek permission from the Fourth Circuit Court of Appeals to review these two issues within ten days from the date of this Order so as to promote the wise use of judicial resources and potentially avoid undue cost to the parties.

IT IS SO ORDERED.

*Joseph F. Anderson, Jr.*

June 25, 2015
Columbia, South Carolina

Joseph F. Anderson, Jr.
United States District Judge